Kane, Robert J., J.
On November 22, 2005, the Bristol County District Attorney (“Commonwealth”) petitioned for Richard Souza’s (“Souza”) civil commitment to the Nemansket Treatment Center (“Treatment Center”) “for an indeterminate period of a minimum of one day and a maximum of such person’s natural life . . .” G.L.c. 123A, §15. After a temporaiy commitment of 60 days to the Treatment Center, pursuant to G.L.c. 123A, §12(6), during which two (2) qualified examiners examined and diagnosed Souza’s sexual dangerousness and issued reports concluding that Souza is not sexually dangerous, the Commonwealth moved for trial.
On October 17, 2006, and October 18, 2006, this court, without juiy, received 18 exhibits and heard from five witnesses, all of whom testified to their clinical opinions on Souza’s sexual dangerousness as defined in G.L.c. 123A, §1. Four of the five witnesses reviewed records and interviewed Souza. These four, who have extensive experience in the assessment of sexual dangerousness, opined that Souza is not sexually dangerous. The fifth witness who examined Souza’s sexual dangerousness did so through a record review. This witness, Dr. Ira Silverman (“Silverman”) currently sits as a member of the Community Access Board where he regularly assesses the sexual dangerousness of individuals confined at the Treatment Center. Silverman, however, has a very limited and dated background in treating sexual offenders, including sexual exhibitionists. In this case, he never interviewed Souza and cannot recollect ever requesting to do so. According to Silverman, Souza fulfills the criteria of having both a mental abnormality and personality disorder as defined in G.L.c. 123A, §1, and is likely to commit sexual offenses unless confined to a secure facility. Based on this court’s review of the evidence and application of legal principles applicable to this proceeding, the court fails to find beyond a reasonable doubt that Souza fulfills the definition of a sexually dangerous person as set forth in G.L.c. 123A, §1.

FINDINGS

Souza, age 43, is the son of Irene Souza, now 72, and Richard Souza, who passed away in 1975. Up until age 12, Souza enjoyed a normal and happy childhood. He was brought up in a household free of domestic violence. In Souza’s words, “we had good Christmas [sic] and Thanksgivings and good holidays.”
Souza’s father (Richard Souza, Sr.) owned his own business installing antennas, and his mother worked as a machine shop operator and nurse’s aide. Richard Souza, Sr., after being diagnosed with bone cancer and *653 enduring a long, painful illness, died when Souza was 12 years old. His death brought on a significant and enduring depression for Souza’s mother who became less involved in family affairs. Shortly thereafter, Souza was burdened with the death of a close maternal uncle who tragically died in a house fire.
Interestingly, Souza’s criminal history shows the advent of his appearances in the Juvenile Court as beginning in 1976, when Souza was 13 years of age. Disturbed and without parental supervision, Souza’s behavior escalated. By the time he was 14, Souza was using both alcohol and marijuana. Marijuana was his drug of choice, which he consumed multiple times daily. On two occasions, between the ages of 14 and 16, Souza used mescaline. During this period of time, Souza felt an intense anger which resulted in numerous fights, 50 arsons and some 14 burglaries. On one occasion, a neighbor complained about the volume of noise from a radio; Souza reacted by hitting the man with a tire iron “a couple of times.” On one occasion, at age 15, Souza engaged in public exhibition of his genitalia while inside his home. During this period of time, Souza constantly appeared in the Juvenile Court.

EDUCATIONAL AND VOCATIONAL HISTORY

Souza attended school until the tenth grade. Beginning in the fifth grade, Souza began acting out and as a result attended the Ruggles Alternative School. Souza was expelled from Durfee High School in the tenth grade for fighting. In 1994, Souza obtained a GED.
Souza’s employment history consists of landscaping, managing a donut shop and auto body work. In the State of California, Souza managed a donut shop for 18 months and his longest span of employment was two years while he worked at an auto body shop. He believes that upon his release, he will be able to resume a previous job at an auto body shop in Fall River; however, nothing in the evidence confirms the availability of such employment or the willingness of the employer to hire Souza.

SUBSTANCE ABUSE HISTORY

As previously stated, at 14 years old, Souza was using both alcohol and marijuana. When Souza was 25 or 26 years of age, on his own, he suddenly stopped using marijuana. In describing his ability to abstain from using marijuana, he said that he always believed that this was not an addiction because he could “always stop.”

SEXUAL HISTORY

When Souza was ten years old, he encountered an elderly man who exposed himself and masturbated. At 10 or 11, Souza masturbated. Between the ages of 12 to 15, he met another adult who exposed him to pornography and to social masturbation.
As to heterosexual relationships, at age 16, Souza began dating a woman whom he impregnated. She eventually bore a child. In 1982, when Souza was 19 years old, he left Massachusetts and went to California. While in California, he met a woman who was 26 or 27 years old, whom he married. The marriage lasted two years. Souza described the marriage as follows:
A very abusive relationship with a lot of alcohol and drugs. We would break things, we would scream at each other. There was no real physical abuse but there was a lot of psychological abuse.
After Souza had returned to Massachusetts in 1994, he met a woman with whom he began to spend time. This relationship has apparently continued and Souza intends to resume it upon his release.
Souza has also admitted to having numerous relationships with prostitutes. He estimates the number of his incidents with prostitutes in California and Massachusetts as fifty.
As previously mentioned, Souza’s masturbation began at ten years old. Eventually Souza developed very obsessive behaviors, including a constant need to clean his body and belongings. On occasion, Souza would shower three or four times a day. With regards to his masturbation, Souza despite having sexual relations with women, would still masturbate on multiple occasions during the course of a day.

CRIMINAL HISTORY

Souza, at age 13, first appeared in the juvenile justice system. Thereafter, until he was incarcerated in 1988, on a five- to seven-year state prison sentence for armed robbery, Souza constantly appeared in juvenile and adult courts on charges of breaking and entering, burglary, stealing and robbery. After Souza was released from prison in 1994, he stopped committing these crimes. At this time, his criminal behavior exclusively assumed the form of sexual offenses consisting of lewd and lascivious acts and one instance of disseminating pornography to a child.

INSTITUTIONAL HISTORY

From 1981 to 2002, Souza was incarcerated in the State of California and on multiple occasions in the State of Massachusetts. His institutional files record stormy and contemptuous behavioral patterns. During his incarceration, Souza faced numerous disciplinary proceedings for assaulting other inmates, disobeying orders, disruption and lying.
During his most recent imprisonment which began in 2002, Souza continued to display his inability to conform with institutional rules. However, in 2003, Souza began taking medications to control his thoughts and libido. After that, Souza’s institutional behavior changed dramatically. During the three years that followed, Souza had only three infractions of institutional rules which were relatively minor. During this period, he began attending treatment programs. These included: (1) transition planning; (2) relapse prevention; (3) violence reduction; (4) introduction to treatment; (5) cognitive skills; (6) non-violent conflict *654 resolution. In general, the reviews of Souza’s performance were positive.

TREATMENT HISTORY

Before 1999, there is no evidence that Souza positively participated in any treatment for his sexual exhibitionism and public masturbation. In 1999, when Souza was released, he began researching obsessive-compulsive disorders and sought psychiatric treatment. The psychiatrist prescribed Paxil (anti-depressant medication), which dramatically reduced Souza’s urge to masturbate. After 18 months, Souza was diagnosed with a thyroid condition and was prescribed medications which apparently reacted poorly with the Paxil. Souza stopped taking the Paxil and again experienced compulsive urges.
While incarcerated in 2002, Souza received Wellbutrin. Apparently Souza did not care for this medication. Later Souza was prescribed Risperdal to control his bad thoughts and Celexa to control his libido. Over the course of the last three years, Souza has reacted positively to the medications and has not masturbated. Apparently, Celexa has eliminated Souza’s sexual erections and Souza’s desire to have an orgasm.
Despite classification inquires about Souza’s willingness to engage in sexual offender treatment, Souza declined the treatment. In speaking with Dr. Feldman about his resistance, Souza explained:
I refuse the treatment. I am afraid I have been in and out of jail all my life. I was part of the group that used to threaten sex offenders. Threaten them and put them in PC [protective custody]. I was in groups that assaulted them. When I was first incarcerated, I never left my cell.
Since March of 2006, Souza has been at the Treatment Center. While there, Souza has enrolled in the limited classes available for sexual offender treatment.
Both Doctors Feldman and Ball have offered striking endorsements of Souza’s motivation to change. Feldman, who for many years has interviewed sexual offenders, found Souza’s pledge to participate in sex offender treatment to be sincere. Listening to his promises, Feldman did not feel as though she was “being manipulated.” Ball also found Souza very sincere in wanting to change and she remarked that she doesn’t believe “he’s fooling me.”

SEXUAL OFFENSES

In 1994, Souza was first convicted of committing lewd and lascivious behavior for which he received a two-year suspended sentence with two years of supervised probation with special conditions. In 1995, Souza was convicted again of committing a lewd and lascivious behavior against a female child and received a two-year committed sentence.
In 1998, Souza faced five indictments covering five incidents of lewd and lascivious speech and behavior. On count I of the second indictment, .Souza received a two-year to two-year and a day state prison sentence, to be executed forthwith. This eliminated the previously imposed House of Correction sentence and ran concurrently with a two-year to two-year and a day sentence imposed on the first indictment. As to count II of the second indictment, the court placed that indictment on file and filed a third 1998 indictment charging lewd and lascivious behavior. On a fourth 1998 indictment for lewd and lascivious behavior, Souza received a concurrent two-year to two-year and one day state prison sentence. On the fifth 1998 indictment, Souza received a sentence of five years probation.
In 2002, Souza faced seven indictments with one indictment charging dissemination of harmful material to a minor and the other six indictments charging lewd and lascivious behavior. The seven indictments spanned a period from October 14, 2001, to March 2, 2002. All of the offenses were committed against children, most of whom were female. One of the indictments charging Souza with disseminating harmful material to a seven-year-old boy, differed from his pattern of prior sexual offenses. In this instance, Souza was in a vehicle when he motioned the child over to the vehicle. Upon approaching, the child saw Souza was without any pants or underwear and that his penis was exposed. Souza handed the child a picture of a naked male. At this time, the child’s father called out to his son, causing Souza to leave the area.
In smother incident dated February 7, 2002, Souza, in a car, circled around another vehicle containing a female child. Souza circled the vehicle containing the female child three times and eventually parked across from her. He turned on his interior light and then with a “very weird look looked down.” The 13-year-old girl noticed that Souza was stroking his penis. At that time, she yelled and Souza fled.
Indictment No. 2002-0580, charged Souza with open and gross lewdness relative to the February 7, 2002 incident with the 13-year-old girl. Souza received a sentence of two years to two years and one day from and after the sentence that had been imposed on a 1998 indictment and concurrent with an identical sentence imposed on Indictment No. 2002-0949-1. As to the remaining five 2002 indictments, Souza received five years probation from and after execution of his committed sentences.

RUUNGS

An initial commitment to the Treatment Center requires proof beyond a reasonable doubt of: (1) a conviction or adjudication of a sexual offense as defined in G.L.c. 123A, §1; (2) the presence of either a mental abnormality or personality disorder as defined in G.L.c. 123A, §1; and (3) that either the mental abnormality or personality disorder makes the person “likely to engage in sexual offenses if not confined to a secure facility.” G.L.c. 123A, §1. As to the first element, this court finds beyond a reasonable doubt *655 that Souza was convicted of sexual offenses defined in G.L.c. 123A, §1, specifically the crime of lewd and lascivious behavior set forth in G.L.c. 272, §16. The court turns to the other two elements below.

PERSONALITY DISORDER

As defined in G.L.c. 123A, §1, a personality disorder may be “a congenital or acquired physical or mental condition.” In 1976, the death of Souza’s father set in motion a stream of events that caused Souza to develop an antisocial personality disorder. Souza’s father’s death overwhelmed Souza’s mother causing her to suffer a severe and prolonged depression that made her unavailable for Souza’s upbringing. Severed from both a father and a mother whose daily instructions and examples serve as the mainsprings for a child’s healthy growth, Souza was asked to rely on his underdeveloped powers of judgment in adapting to society’s expectations and rules. Overwhelmed and confused by his predicament, Souza became angry and alienated. He expressed his anger and alienation by setting trash cans on fire, stealing and burglarizing homes. His wild ways made him unfit for classroom instruction, resulting in his eventual expulsion.
Souza’s wayward behavior extended to his use of alcohol and marijuana. Marijuana became his drug of choice which he consumed on several occasions during the course of a day. Sexually, he masturbated at 10 and exposed his penis at 15. At 16, he impregnated a girl whom he eventually abandoned. Souza’s immersion, over the course of many years, in this alienated lifestyle formed the traits of his personality. Whenever life became too stressful, his feelings of victimization and rage made him feel entitled to act out by insulting the rights of others.
Souza’s habitual behavioral style, which began when Souza was 12, fits the clinical definition of an antisocial personality disorder which bears a synergistic relationship to Souza’s mental disorder of exhibitionism.

MENTAL ABNORMALITY

Under G.L.c. 123A, a mental abnormality constitutes:
[A] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons.
Souza’s disturbed thinking featuring feelings of victimization and rage provoked Souza’s non-sexual, criminal conduct in the 1970s and 1980s. From the period of 1994 to 2002, his disturbed thinking and his abnormal urge to masturbate caused him to relieve his irritability and rage by victimizing others, particularly pre-pubescent children. Souza released his rage by exercising his perceived entitlement to victimize others, by insulting and frightening them when he displayed his penis and masturbated. While Souza admits to this irresistible course of conduct, he challenges the finding that it makes him “a menace to the health and safety of other persons.” I disagree with his allegation that this does not make him a menace.
The stated purpose of G.L.c. 123A is, “to protect forthwith the vulnerable members of our communities from sexual offenders.” See Stat. 1999, c. 74, Emergency Preamble. This statutory interest in protecting vulnerable individuals from being subjected to harm encompasses lewd and lascivious behavior, a crime listed as a statutory basis for a sexual offender’s indefinite commitment under G.L.c. 123A, §15. The harm spoken of in G.L.c. 123A, naturally imports both physical and psychological harm. See McHoul Petitoner, 445 Mass. 143, 153-55 (2005) (“[t]he definition of injury is not limited to physical harm”). In Davis, Petitioner, the Supreme Judicial Court, in addressing the parameters of G.L.c. 123A in its prior iteration, observed that “ ‘aggression’ has been held to include ‘non-violent sexual advances by adults upon children,’ the resulting ‘injury’ required by the statute being ‘psychological, mental or emotional trauma’ to the child.” Davis, Petitioner, 383 Mass. 645, 649 (1981) (citation omitted).
Here, Souza’s sexual behavior did not simply constitute indecent exposure, a misdemeanor, but constituted lewd and lascivious behavior, a felony. See G.L.c. 272, §16. The behavior was often committed upon children, a group deserving of special protection under G.L.c. 123A. Therefore, I find and rule that Souza’s behavior makes him a menace to the health of other individuals.
Further I find that Souza’s antisocial personality disorder and mental abnormality are still present, albeit controlled by the administration of medications. Souza’s use of Risperdal presently stanches Souza’s disturbed thinking which invokes his antisocial behaviors and Celexa eliminates Souza’s sexual desire to masturbate. Without the use of Risperdal, Souza’s antisocial personality disorder would activate and without the use of Celexa, Souza’s abnormal sexual urges would emerge.
In summary, this court finds and rules that the evidences establishes beyond a reasonable doubt that Souza possesses a mental abnormality, particularly exhibitionism, which affects his emotional or volitional capacity in a manner that predisposes him to the commission of lewd and lascivious acts that make him a menace to the health and safety of other persons. Furthermore, I find beyond a reasonable doubt that Souza’s antisocial personality disorder constitutes a personality disorder which results in a general lack of power by the force of his disturbed thinking to control his abnormal urge to masturbate.

*656
LIKELIHOOD TO ENGAGE IN SEXUAL OFFENSES

As observed by the Supreme Judicial Court in Commonwealth v. Boucher, 438 Mass. 274, 277 (2002): “[T]he term ‘likely’ is not intended as a standard or burden of proof.” The term “likely” rather must be assessed “on a case by case basis, by analyzing a number of factors, including the seriousness of the threatened harm, the relative certainty of the anticipated harm, and the possibility of successful intervention to prevent that harm.” Id. at 276. I now consider these factors in turn.

SCALE OF HARM

While I recognize the distinction in degrees of harm between hands-on and hands-off sexual offenses, I refuse to treat the commission of lewd and lascivious behavior lightly. By its statutory classification of lewd and lascivious behavior as a felony and by its inclusion of the crime as a designated offense within G.L.c. 123A, §1, the Legislature manifested its understanding of the serious consequences emanating from exposure of individuals, particularly children, to the open display of a penis aggravated by the intrusive specter of a man masturbating.
Indeed, the Legislature’s enactment of weighty sanctions for hands-off offenses, such as dissemination of child pornography, has spoken clearly to the public safety threat posed by the sexual corruption of minors. This regard for protecting minors from exposure to pornography, sexual organs and sexual acts is both wise and weighty. Our mainstream social structures and customs have been purposely designed for the intention of cabining pre-pubescent children from exposure to these things. Our culture radiates a wide scale of messages, both express and subtle, to children that they ought not see sexual organs or sexual acts.
When someone therefore displays his sexual organ and engages in a sexual act, that display naturally horrifies and profoundly threatens the child who can hardly understand what will happen next. Our common sense does not deny the possible infliction of an enduring emotional harm upon a child who witnesses such deviant sexual displays. Indeed, the deposit of these memories within a child’s consciousness may dampen the child’s sense of safety and confidence which is so indispensable to social growth.
Therefore, this court determines that the scale of harm incidental to the commission of lewd and lascivious behavior constitutes a serious harm warranting the vigilant protection of children from such sexual displays.

DEGREE OF CERTAINTY OF REOFFENSE

As to the degree of certainty that the harm in this case will reoccur, I agree with Feldman that Souza is unlikely to reoffend. Support for Feldman’s opinions on Souza’s likelihood of abstaining from further sexual exhibitionism appears in the evidence which chronicles Souza’s sincere efforts starting in 1999 to control his sexual exhibitionism. His study of compulsive disorders in 1999 led him to psychiatric treatment. After a psychiatrist prescribed Paxil, he stopped engaging in sexual exhibitions. Souza lost control over his sexual disorder, however, when his thyroid medication apparently compromised Paxil’s benefits, and Souza stopped using Paxil entirely.
Upon his return to the Department of Corrections, Souza again took medicine for his disturbed thinking; but it did not help. The following year, psychiatric services prescribed Celexa and Risperdal, which have allowed Souza to be free from disturbed thinking patterns and sexual preoccupation.
As Feldman and Ball report, Souza appears sincerely committed to continuing his use of medications and participation in sexual offender therapy. I note that Souza resisted participation in DOC’s sexual offender treatment because of his discomfort in interacting with a population whom he had generically abused in the past. Silverman finds fault with Souza’s relapse plan, which admittedly needs refinement in view of his only recent participation in sexual offender treatment. But Souza has made preparations for his release. He has secured MassHealth coverage. He is licensed to drive. Souza has made contact with Ball and intends to engage in sexual offender treatment. He has a work history and an apparent capacity to work in an auto body shop.

INTERVENTIONS

Souza will be on release under the supervision of probation.[1] Though I note that in the past Souza has committed new criminal offenses while on probation and even in sexual offender treatment, he is now 43 years of age and has adopted a new outlook as evidenced by his recent DOC commitment, which showed a sharp drop in his institutional infractions. The probation, which will last for five years, will require Souza to participate in sexual offender treatment. This probation ought to require Souza to continue to take his medication. These protective measures combined with Souza’s reduced risk of reoffending causes this court to reasonably doubt that Souza, if released, will be likely to commit sexual offenses.

ORDER

Based on the foregoing, this court finds reasonable doubt that Souza is a sexually dangerous person as defined in G.L.c. 123A, §1 and therefore DISMISSES the petition for his civil commitment.

The court intends to forward this decision to the Probation Department for their review.